IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COLLEGESOURCE, INC.              :       CIVIL ACTION
                                 :
              v.                 :
                                 :
ACADEMYONE, INC., et al.         :       NO. 10-3542


MEMORANDUM

McLaughlin, J.                              April 22, 2011


        This case involves two companies that provide online
college transfer services.  The plaintiff CollegeSource has
accused the defendant AcademyOne of republishing course catalogs
and course information that CollegeSource digitized and made
available to its customers.  These companies use course
descriptions from academic institutions to facilitate transfer
agreements between schools and to help users determine whether
courses at different institutions are equivalent.

        The plaintiff seeks a preliminary injunction under
theories of breach of contract, unjust enrichment, and false
advertising.  CollegeSource asserts that AcademyOne breached
CollegeSource's Terms of Use by republishing course descriptions
taken from CollegeSource's course catalogs or alternatively that
AcademyOne has been unjustly enriched.  CollegeSource also
accuses AcademyOne and its CEO David Moldoff of false advertising
by sending a letter containing false statements to various
academic institutions under the guise of a freedom of information

request.  CollegeSource seeks to enjoin the defendants from using course descriptions obtained from the plaintiff's course catalogs and to require the defendants to issue corrective advertising regarding the freedom of information letters.

The Court concludes that the plaintiff has failed to satisfy its burden that it is entitled to a preliminary injunction.  The Court first concludes that the plaintiff has not shown that it will suffer irreparable injury in the absence of an injunction for its breach of contract and unjust enrichment claims.  The Court also concludes that the plaintiff has failed to show a likelihood of success on the merits of its false advertising claim because the statements in the freedom of information letters are at least ambiguous and there has been an insufficient showing of consumer confusion.  The Court will therefore deny the plaintiff's motion.

I.   Procedural History

On July 20, 2010, the plaintiff initiated this law suit and filed for a temporary restraining order to preserve evidence on AcademyOne's computers.  On August 3, 2010, the Court denied the plaintiff's motion and instructed both parties not to destroy any potentially relevant information.  On October 19, 2010, the defendants moved to dismiss several counts of the plaintiff's amended complaint.  On December 6, 2010, the plaintiff filed the

instant motion for preliminary injunction.

On January 24, 2011, the Court held a preliminary injunction hearing and on January 26, 2011 held oral argument on the plaintiff's motion.  At the hearing, the Court heard live testimony from Kerry Cooper, CEO of CollegeSource; Stanley Novak, Director of Operations for CollegeSource; David Stanely, Manger of Implementation for AcademyOne; and David Moldoff, CEO of AcademyOne.  The deposition testimony of Harry Cooper, the founder of Career Guidance Foundation, was also incorporated into the record.  The plaintiff filed proposed findings of fact and conclusions of law on February 17, 2011 and the defendant filed proposed findings of fact and conclusions of law on February 22, 2011.

This case is related to two previously filed lawsuits. See AcademyOne, Inc. v. CollegeSource, Inc., No. 08-5707, 2009 WL 5184491 (E.D. Pa. Dec. 21, 2009) (Padova, J.); CollegeSource, Inc. v. AcademyOne, Inc., No. 08-1987, 2009 U.S. Dist. LEXIS 75513 (S.D. Cal. Aug. 24, 2009).  In the Pennsylvania case before Judge Padova, the Court granted CollegeSource's motion for summary judgment on AcademyOne's claims of false advertising, trademark infringement, and cybersquatting.  AcademyOne, Inc. v. CollegeSource, Inc., No. 08-5707, 2009 WL 5184491, at *7, *16-*17 (E.D. Pa. Dec. 21, 2009).  In the California action, the District Court concluded that it lacked personal jurisdiction over

AcademyOne for claims similar to those brought in this lawsuit. CollegeSource, Inc. v. AcademyOne, Inc., No. 08-1987, 2009 U.S. Dist. LEXIS 75513, at *20-21 (S.D. Cal. Aug. 24, 2009).  The plaintiff's appeal is currently pending before the United States Court of Appeals for the Ninth Circuit.  See CollegeSource, Inc. v. AcademyOne, Inc., No. 09-56528 (9th Cir.).

II.  Findings of Fact

    A.   Background

       1.   CollegeSource and AcademyOne both provide course information services to higher education organizations.

       2.   CollegeSource is the successor in interest to the non-profit Career Guidance Foundation ("CGF"), which was founded in 1971.  (Verified Compl. ¶ 5.)

       3.   AcademyOne was founded in 2004.  (Notes of Testimony, Evidentiary Hearing, January 24, 2011 ("N.T.") 114:2-5.)

       4.   Since approximately 1992, CGF and later CollegeSource have digitized college catalogs and offered them in various formats.  (H. Cooper Dep. 39:2-24, 41:22-42:11; N.T. 197:4-19.)

       5.   Beginning in 1996, CGF began offering digitized course catalogs on the Internet.  (H. Cooper Dep. 42:12-18.)

       6.   CollegeSource offers PDF versions of whole college

course catalogs online through its product "CollegeSource Online."  (N.T. 22:2-10; 87:16-23.)

7.   CollegeSource offers another product called Transfer Evaluation Service ("TES"), which is primarily marketed to institutions seeking information regarding the transfer of credits from one institution to the other.  (N.T. 22:2-10; 47:7-11.)

8.   In mid-2005, AcademyOne developed two products: the National Course Atlas and the Course Equivalency Management Center ("CEMC").  (N.T. 119:2-17.)

9.   AcademyOne's National Course Atlas provides a catalog of current course information at educational institutions, which is used for comparing the academic equivalence of courses at different institutions.  (N.T. 114:9-116:23; 118:2-119:21; Def.'s Exs. 38, 39.)

10.   AcademyOne's CEMC is an online program that allows academic institutions to create and centralize transfer agreements and policies using the National Course Atlas.  It is used to help faculty map out the courses that would go into a transfer agreement in a proactive fashion.  (N.T. 120:25-121:20.)

B.   Course Catalogs

11.   Over the past sixteen years, CollegeSource has accumulated more than 39,000 digital course catalogs.  (N.T.

5

42:20-43:1.)

12.   CollegeSource acquired these course catalogs by contacting individual colleges and requesting copies of their catalogs.  (N.T. 49:21-22; 202:14-203:09.)

13.   CollegeSource obtained permission to use their catalogs by contacting colleges directly.  CollegeSource did not present evidence that it has any formal contracts or licensing agreements with any colleges or universities for the distribution of course catalogs.  (N.T. 205:16-22.)

14.   Colleges and universities provide CollegeSource with either electronic or paper copies of their course catalogs. CollegeSource scans paper catalogs and processes the scanned images using optical character recognition ("OCR").  (N.T. 78:14-79:9.)

15.   CollegeSource formats the electronic catalogs it receives as well as the scanned/digitized catalogs with a uniform cover ("splash page").  CollegeSource also makes the data searchable and appends its Terms of Use to each catalog.  (N.T. 32:7-11; 67:12-68:1.)

16.   All of the catalogs that CollegeSource has either scanned or electronically converted contain Terms of Use that the information may only be used for personal use and that data may not be displayed for use on another website or service.  (N.T. 50:4-6; Pl.'s Ex. 3.)

6

17.   The following Terms of Use appear in the catalogs

in CollegeSource's collection:

> Copyright & Disclaimer Information
> Copyright © [1994-2007].
> CollegeSource® and Career Guidance Foundation
> CollegeSource® digital catalogs are
> derivative works owned and copyrighted by
> CollegeSource®, Inc. and Career Guidance
> Foundation. Catalog content is owned and
> copyrighted by the appropriate school.
>
> While CollegeSource®, Inc. and Career
> Guidance Foundation provides [sic]
> information as a service to the public,
> copyright is retained on all digital
> catalogs.
>
> This means you may NOT:
> *   distribute digital catalog files to
> others,
> *   "mirror" or include digital catalog
> files on an Internet (or Intranet) server,
> *   modify or re-use digital catalog
> files without the express written consent of
> CollegeSource® and Career Guidance Foundation
> and the appropriate school.
> You may:
> *   print copies of the information for
> your own personal use,
> *   store the files on your own
> computer for personal use only, or
> *   reference this material from your
> own documents.
>
> CollegeSource® and Career Guidance Foundation
> reserves [sic] the right to revoke such
> authorization at any time, and any such use
> shall be discontinued immediately upon
> written notice from CollegeSource ® and
> Career Guidance Foundation.

(Pl.'s Ex. 3.)

18.   In 2006, AcademyOne began collecting course

descriptions and college catalogs for the National Course Atlas
and the CMEC.  (N.T. 114:25-116:15, 127:13-14; Stanley N.T.
5:12-6:5;[1] Def.'s Ex. 32.)

19.   Approximately 80 schools directly provided course
data to AcademyOne.  (Stanley N.T. 6:6-13.)

20.   AcademyOne also collected course descriptions by
visiting the websites of approximately 4,000 colleges and
universities.  Many of these catalogs were collected by
AcademyOne's Chinese contractor, Beijing Zhongtian-Noah Sports
Science Co., Ltd. ("Noah").  (Stanley N.T. 5:12-9:17; 42:19-25.)

21.   About half of the 4,000 schools post course
descriptions on their website in HTML format.  The schools that
did not post HTML versions of their course descriptions post them
as PDF files. (Stanley N.T. 7:16-9:3.)

22.   Noah downloaded approximately 18,000 PDF files
from the websites of colleges and universities.  (Stanley N.T.
7:2-9; N.T. 123:16-23.)

23.   CollegeSource conducted an investigation and found
approximately 680 catalogs that were digitized or converted by
CollegeSource on AcademyOne's www.collegetransfer.net website,
all with Terms of Use intact. (N.T. 31:9-32:2, 35:21-36:6;
88:20-91:2; Pl.'s Ex. 13.)

---

[1]   The preliminary injunction testimony of David Stanely
is contained in a separate transcript from the rest of the
preliminary injunction hearing.  The Court will refer to the page
numbers for Mr. Stanely's testimony as "Stanley N.T."

24.   Some of the 680 catalogs may have been downloaded by Noah because some colleges and universities re-direct or "back-link" to CollegeSource's collection of PDF catalogs or because the colleges and universities posted copies of CollegeSource's catalogs directly on their own website.  (N.T. 125:19-126:7.)

C.   Catalog Licensing and Publication

25.   On October 4, 2005, AcademyOne Vice President Ed Johnson emailed CollegeSource sales representative Dave Hunt and requested a quote for licensing CollegeSource's catalogs in electronic form.  (N.T. 22:16-25; Pl.'s Ex. 1.)

26.   AcademyOne made additional contacts to license these catalogs through January, 2006.  (N.T. 24:5-23; Pl.'s Exs. 2, 5.)

27.   CollegeSource denied these requests.  (Verified Compl. ¶ 38.)

28.   In April of 2007, CollegeSource became aware that AcademyOne had posted course catalogs bearing CollegeSource's logos and Terms of Use to AcademyOne's www.collegetransfer.net website.  (N.T. 55:13-17; 84:8-15.)

29.   On or around April 20, 2007, CollegeSource's CEO, Ms. Cooper, hand-delivered a cease-and-desist letter to AcademyOne's CEO, Mr. Moldoff at a conference they were both

attending.   (N.T. 36:21-37:1.)

    30.   In the letter, CollegeSource indicated that
AcademyOne had posted PDFs created by CollegeSource on
AcademyOne's website in violation of several laws including the
Copyright Act of 1976.  CollegeSource demanded that AcademyOne
remove any CollegeSource material from its website.  (Pl.'s Ex.
14.)

    31.   In response to the plaintiff's cease and desist
letter, AcademyOne removed the links to every PDF file of a whole
course catalog on its website.  However, the actual PDF files
themselves were not immediately removed.  To a normal visitor,
the PDF files would not have been visible.  A visitor who had the
direct URL of the PDF catalogs, however, would still be able to
access the catalogs directly.  (N.T. 123:24-125:2.)

    32.   A few months later in mid-2007, AcademyOne also
removed the PDF files of every whole catalog from its servers and
deleted the feature allowing users to access course catalogs.
(N.T. 126:8-127:1.)

    33.   The 680 whole catalogs in question have not been
in AcademyOne's database since mid-2007.  AcademyOne does,
however, retain computer backup and litigation copies of the
files at issue in compliance with its litigation obligations.
(N.T. 127:2-4; 129:10-130:19.)

    34.   Between April 2007 and April 2010, Noah

10

re-collected course descriptions from college and university websites. (Stanley N.T. 9:1-17)

35. During this time, AcademyOne instituted new protocols to safeguard against downloading PDFs from CollegeSource. (Stanley N.T. 9:18-10:11)

36. Specifically, AcademyOne instructed Noah not to download PDFs from a CollegeSource Internet address. (Stanley N.T. 9:18-10:11)

37. In addition, AcademyOne instructed Noah to provide it with the list of the Internet addresses from which it had obtained catalogs or course descriptions. (Stanley N.T. 9:18-10:11)

38. AcademyOne then checked each of those addresses to ensure that they were not a CollegeSource webpage. (Stanley N.T. 9:18-10:11)

39. When CollegeSource initiated this law suit in July 2010, AcademyOne learned that, despite the safeguards implemented, it had posted course descriptions from two course catalogs that may have been from CollegeSource's website. (Stanley N.T. 10:18-12:2; Def.'s Exs. 29-31.)

40. CollegeSource identified course descriptions on AcademyOne's website from the University of Illinois at Urbana-Champaign and North Greenville University as originating from CollegeSource's catalogs. (N.T. 11:24-12:3)

41.  AcademyOne removed these course descriptions and all other course descriptions for the University of Illinois at Urbana-Champaign and North Greenville University after becoming aware of the issue.  (Stanley N.T. 16:24-17:14)

42.  After CollegeSource filed this lawsuit, AcademyOne also took steps to address CollegeSource's claim that AcademyOne was continuing to copy course descriptions from PDFs of whole course catalogs that AcademyOne removed from its website and servers in April 2007.  (Stanley N.T. 10:18-16:23)

43.  AcademyOne removed from its website every course description that it uncovered from its own investigation that might be derived from CollegeSource's materials.  (Stanley N.T. 17:12-14; Def.'s Ex. 1)

44.  AcademyOne compiled a list of descriptions to remove by searching for "CollegeSource" and "Career Guidance Foundation" in all of the source documents for the data that Noah collected.  (Stanley N.T. 18:5-20:16; Def.'s Ex. 1.)

45.  AcademyOne has since reposted course descriptions for certain schools after verifying that the course descriptions were derived from sources other than CollegeSource.  (Stanley N.T. 20:17-21:7)

46.  When CollegeSource filed its motion for preliminary injunction on December 6, 2010, CollegeSource provided AcademyOne with a list of the 680 catalogs it believed

were derived from CollegeSource's catalogs.  (Stanley N.T.
21:13-18)

47.  AcademyOne removed the course descriptions for all
schools whose catalogs were on this list but not already taken
down in September 2010.  (Stanley N.T. 21:13-23)

48.  There is no evidence that course descriptions from
the 680 catalogs currently appear on AcademyOne's website or in
its database.  (Stanley N.T. 19:12-22:21)


D.   Freedom of Information Letters

49.  In July 2010, David Moldoff sent letters to public
colleges and universities under applicable state freedom of
information or "sunshine" laws ("FOI letters").  (N.T. 131:2-23;
Def.'s Ex. 44.)

50.  These FOI letters requested any copies of any
correspondence, emails or contractual agreements between the
academic institution and CollegeSource that grant CollegeSource
or the Career Guidance Foundation the authority to create and
claim a derivative copyright of the institutions' printed or
digital catalogs or add CollegeSource's various enhancements to
the catalogs. (N.T. 131:2-23; Def.'s Ex. 44.)

51.  The purpose of the FOI letters was to determine if
any such agreements or licenses exist.  (N.T. 133:2-136:25.)

52.  Every college or university that responded to

13

AcademyOne's request indicated that there are no agreements giving CollegeSource the right to restrict the use of the course descriptions created by the schools.  (N.T. 137:1-2-139:20; Def.'s Exs. 45, 47-49.)

53.  David Moldoff was the author of these letters and is not an attorney.  (N.T. 111:21-114:4, 131:9-13.)

54.  In response to the FOI letter, CollegeSource received questions from academic institutions regarding the content of the letter.  One of CollegeSource's clients asked CollegeSource to remove the institution's catalog from CollegeSource's collection.  (N.T. 52:5-53:14.)

III. Analysis

The plaintiff seeks an injunction on the basis of breach of contract, unjust enrichment, and false advertising. The plaintiff seeks to enjoin AcademyOne from using information derived from its course catalogs and to take corrective advertising measures.

A party seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700,

708 (3d Cir. 2004).  The movant bears the burden of establishing

every element in its favor.  See P.C. Yonkers, Inc. v.

Celebrations the Party & Seasonal Superstore, LLC, 428 F.3d 504,

508 (3d Cir. 2005).  The grant of a preliminary injunction is an

"extraordinary remedy" that should be granted only in "limited

circumstances."  Kos, 369 F.3d at 708 (citation omitted).

    A.    Breach of Contract and Unjust Enrichment

        CollegeSource seeks injunctive relief because of the

purported continuing use of course descriptions gathered from

CollegeSource's catalogs in violation of the plaintiff's Terms of

Use.  CollegeSource contends that AcademyOne has breached a

contract with CollegeSource by violating CollegeSource's Terms of

Use.  In the alternative, CollegeSource argues that even if

AcademyOne has not breached an enforceable contract, AcademyOne

has been unjustly enriched.

        The Court first addresses the irreparable injury

requirement.  To obtain injunctive relief, the plaintiff must

make a clear showing of "immediate irreparable injury" or a

"presently existing actual threat."  Acierno v. New Castle Cnty.,

40 F.3d 645, 655 (3d Cir. 1994) (citations and quotations

omitted).  An injunction is not appropriate when damages are

adequate.  Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847

F.2d 100, 102 (3d Cir. 1988) ("a purely economic injury,

compensable in money, cannot satisfy the irreparable injury requirement"). The preliminary injunction must be the only way of protecting the plaintiff from harm. <u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>, 882 F.2d 797, 801 (3d Cir. 1989).

CollegeSource presented evidence that AcademyOne displayed course information from 680 course catalogs that may have originated from CollegeSource's catalogs at the time this law suit was filed. However, AcademyOne has removed from its website and databases every course description from every school on the list of 680 schools. David Moldoff, CEO of AcademyOne, testified that AcademyOne has not replaced any course description for the 680 schools until it has confirmed that the description came from a source other than CollegeSource.

The plaintiff has expressed concern that without an injunction, nothing would prevent AcademyOne from re-posting information that was originally gleaned from CollegeSource's digitized catalogs. The Court finds this contention unpersuasive because AcademyOne has complied with CollegeSource's take-down requests. AcademyOne has removed all of the materials that the plaintiff cited as potentially derived from CollegeSource as well as instituted procedural safeguards to reduce the likelihood that AcademyOne will publish course descriptions from CollegeSource's catalogs in the future.[2]

---

[2]     Furthermore, the timing of the plaintiff's motion also undermines its claim of irreparable injury. CollegeSource

16

There does not appear to be any "presently existing actual threat" that the plaintiff may suffer irreparable harm if it is not granted a preliminary injunction on its breach of contract and unjust enrichment claims. See Acierno, 40 F.3d at 655. The plaintiff has presented evidence of, at most, "a possibility of a remote future injury." Id. Because the Court concludes that the plaintiff has not shown that it will suffer irreparable injury in the absence of an injunction for its breach of contract and unjust enrichment claims, the Court does not need to address the remaining preliminary injunction factors. See Yonkers, 428 F.3d at 508 ("The burden lies with the plaintiff to establish every element [for a preliminary injunction] in its favor . . . ."). The Court next turns to the plaintiff's false advertising claim.

B.   False Advertising

CollegeSource seeks injunctive relief in the form of corrective advertising regarding the freedom of information letters that AcademyOne sent to colleges and universities. Section 43(a) of the Lanham Act provides creates a cause of

_____

initially brought its complaint in the California action in 2008. See CollegeSource, Inc. v. AcademyOne, Inc., No. 08-1987, 2009 U.S. Dist. LEXIS 75513 (S.D. Cal. Aug. 24, 2009). The complaint in this case was filed on July 20, 2010. However, it was not until December 6, 2010, that the plaintiff filed this motion for preliminary injunction. The Court also notes that any injury the plaintiff has suffered for breach of contract or unjust enrichment may be remedied by damages, if appropriate.

action for false advertising.  15 U.S.C. § 1125(a).  There are two different theories of recovery for false advertising under section 43(a).  A defendant may be liable for false advertising if the commercial statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers.  Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 586 (3d Cir. 2002).

The United States Court of Appeals for the Third Circuit has held that survey evidence that 15% of the respondents were misled was sufficient to establish "actual deception or at least a tendency to deceive a substantial portion of the intended audience."  Id. at 594 (citation omitted).  See also Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 466-67 & n.15 (4th Cir. 1996) (15-20% confusion was sufficient to establish "actual confusion . . . to a significant degree"); Goya Foods, Inc. v. Condal Distribs., Inc., 732 F. Supp. 453, 457 n.7 (S.D.N.Y. 1990) (9-10% confusion was sufficient to demonstrate "meaningful evidence of actual confusion").

If a claim is literally false, a court may grant relief without considering whether the buying public was actually misled.  Novartis, 290 F.3d at 586.  In analyzing whether an advertisement is literally false, a court must first determine the unambiguous claims made by the advertisement, and second,

18

whether those claims are false.  <u>Id.</u>  Only an unambiguous message can be literally false.  <u>Id.</u> at 587.  The Court of Appeals has explained that a common theme among cases concluding that an advertisement is literally false is that the "consumer will unavoidably receive a false message from the product's name or advertising."  <u>Id.</u> at 586.  The Court addresses the plaintiff's likelihood of success on the merits.

At the preliminary injunction hearing, the Court was presented with the letter that Mr. Moldoff sent to colleges and universities seeking public records under different states' freedom of information statutes (the "FOI letter").  (<u>See</u> Def.'s Ex. 44.)  The FOI letter sought copies of any agreements between the academic institution and CollegeSource that would "grant[] CollegeSource or the Career Guidance Foundation the authorization to create and claim a derivative copyright of [the academic institution's] printed or digital catalog for [2006-2010]; limit the rights of distribution of the electronic version located on their website; archive the file; add their logo and Terms of Use to the front of each catalog and charge for access to the catalog."  <u>Id.</u>  The letter further explained that the request was made in connection with "copyright claims filed" in this lawsuit. <u>Id.</u>

The plaintiff argues this letter constitutes a form of advertising and that three aspects of the defendant's letter are

literally false.[3]  First, the plaintiff argues that no copyright claims are asserted in this lawsuit.  Second, the plaintiff argues that it is false to state that CollegeSource is attempting to preclude AcademyOne "and other software providers" from providing automated student transfer systems.  Third, CollegeSource argues that it does not claim control of catalogs on its clients website.  The Court cannot conclude that these statements are literally false.

First, although no violation of copyright law is asserted in this lawsuit, such an understanding and description is a reasonable characterization of this matter for a non-lawyer to make.  The heart of the violation alleged in this action is that AcademyOne violated the copyright and disclaimer notice appended to CollegeSource's catalogs by extracting course descriptions for its own products.[4]  In essence, the rights CollegeSource seeks to vindicate, though styled in terms of

---

[3]    The Court does not need to address the defendants' argument that the letter does not constitute a form of advertising because the Court concludes that even if the letter is a form of advertising, it is not literally false and there was insufficient evidence of a tendency to deceive consumers.

[4]    CollegeSource's "Copyright & Disclaimer Information" states in part "CollegeSource® and Career Guidance Foundation CollegeSource® digital catalogs are derivative works owned and copyrighted by CollegeSource®, Inc. and Career Guidance Foundation. Catalog content is owned and copyrighted by the appropriate school.  While CollegeSource®, Inc. and Career Guidance Foundation provides [sic] information as a service to the public, copyright is retained on all digital catalogs." (See Pl.'s Ex. 3.)

breach of contract, are very similar to a lay conception of copyright infringement.  Indeed, the plaintiff has cited to several copyright cases to support its claim for injunctive relief and its original cease and desist letter declared AcademyOne's actions to be a violation of the Copyright Act.[5]

In addition, Mr. Moldoff testified that his reference to copyright was meant to refer to CollegeSource's copyright notice included in its digitized catalogs, not a legal cause of action. (N.T. 132:19-133:16.)  The Court concludes that Mr. Moldoff's statement referring to copyright claims is ambiguous and cannot be considered literally false.

Second, Mr. Moldoff's contention that CollegeSource is attempting to prevent AcademyOne and other software providers from providing automated student transfer systems is ambiguous. CollegeSource argues that only AcademyOne is the subject of the lawsuit and thus it is false to refer to "other software providers."  Although this lawsuit is only brought against AcademyOne, Mr. Moldoff had reason to believe that CollegeSource intended to pursue claims against other companies that might utilize CollegeSource's digitized information based on statements

---

[5]     See Pl.'s Mot. at 28 citing Value Group, Inc. v. Mendham Lake Estates, L.P., 800 F. Supp. 1228, 1234 (D.N.J. 1992) (copyrighted architectural plans); Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1254 (3d Cir. 1983) (copyrighted computer programs); FMC Corp. v. Control Solutions, Inc., 369 F. Supp. 2d 539, 575 (E.D. Pa. 2005) (copyright of product label).  See also Pl.'s Ex. 14 at 2.

made at the Postsecondary Electronic Standards Council meeting.
(N.T. 133:18-136:4.)

Third, it was not unambiguously false for Mr. Moldoff
to state that "CollegeSource claims control of the digital
catalogs they collect, even if they reside on your website."
AcademyOne presented evidence that some colleges and universities
either directly posted, or provided links to, CollegeSource's
digitized catalogs that contain CollegeSource's Terms of Use.  In
this way, a university's course catalogs that appear to an
ordinary user to be on the university's website may be subject to
CollegeSource's asserted Terms of Use.

The Court concludes that these statements are either
true, or at least ambiguous.  The Court must next address whether
the letters had a tendency to deceive.  The plaintiff presented
evidence that one institution requested that its catalog be
removed from CollegeSource's collection.  No evidence was
presented for the specific reason of the institution's request.
(N.T. 53:4-14.)  Ms. Cooper also testified that several other
institutions contacted CollegeSource to learn more about the law
suit and expressed confusion.  However, no evidence was presented
regarding how many inquiries were received or if any confusion
was actually caused by the letter itself.

The Court concludes the plaintiff has not shown that it
has a likelihood of success on a claim for false advertising

stemming from Mr. Moldoff's freedom of information letters because the statements are not literally false and the plaintiff has presented insufficient evidence that the letters had a tendency to deceive the intended audience.  The Court does not need to address the defendants' other arguments or the remaining preliminary injunction factors.  See <u>Yonkers</u>, 428 F.3d at 508.

IV. <u>Conclusion</u>

The Court concludes that the plaintiff has failed to satisfy its burden that it will suffer irreparable harm without the issuance of a preliminary injunction for its breach of contract and unjust enrichment claims.  The Court also concludes that the plaintiff has failed to show a likelihood of success on the merits for its false advertising claim regarding the FOI letter.  The Court will therefore deny the plaintiff's motion.

An appropriate Order shall issue separately.