IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COLLEGESOURCE, INC.  :  CIVIL ACTION
         :
    v.     :
         :
ACADEMYONE, INC.   :  NO. 10-3542

MEMORANDUM

McLaughlin, J.         October 25, 2012

This case concerns two companies providing online college transfer services.  The plaintiff, CollegeSource, Inc. has accused the defendant, AcademyOne, Inc., of republishing course catalogs and course information digitized and maintained by CollegeSource.  Both companies utilize the course catalogs and information to serve schools and individual students seeking to transfer credits from one school to another.

The defendant has moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on all remaining counts of the Amended Complaint: Violation of the U.S. Computer Fraud and Abuse Act ("CFAA") (Count III); Breach of Contract (Count IV); Unjust Enrichment (Count V); Trademark Infringement (Count VI) and Unfair Competition (Count VII) under U.S. Lanham Act; Declaration of Trademark Invalidity Due to Fraud on U.S.P.T.O. (Count VIII); and False Advertising under U.S. Lanham Act (Count IX).  The Court grants the defendant's motion for

summary judgment in its entirety.

I.   <u>Summary Judgment Record</u>

     CollegeSource's claims stem from four distinct sets of
facts.[1]  First, AcademyOne's course catalog collection efforts
form the basis of the plaintiff's breach of contract, unjust
enrichment, and CFAA claims.  Second, AcademyOne's purchase of
Internet search engine AdWords relates to the claims of trademark
infringement and unfair competition under the Lanham Act.  Third,
AcademyOne's registration of the "CollegeTransfer.net" trademark
relates to the declaratory judgment sought by the plaintiff on
the term's trademark invalidity.  The final set of facts,
respecting correspondences and advertising proffered by
AcademyOne, relates to CollegeSource's false advertising claim.

     A.   <u>Factual Background</u>

          1.   <u>CollegeSource and Career Guidance Foundation</u>

     The plaintiff, CollegeSource, Inc., is a company that
provides the public with information and data services relating
to college and university course curriculums, equivalencies, and
transferability. It is the successor in interest to Career

---

     [1]  The facts presented here are undisputed unless otherwise
noted.  Disputed facts are read in the light most favorable to
the nonmoving party, the plaintiff.  Sheridan v. NGK Metals
Corp., 609 F.3d 239, 251 n.12 (3d Cir. 2010).

Guidance Foundation ("CGF"), which was founded in 1971.  Am.
Compl. ¶ 5; Tr. Prelim. Inj. Hr'g 22:2-10 (D. Ex. 1[2]).

CollegeSource offers three products: CollegeSource
Online, the Transfer Evaluation System ("TES"), and CataLink.
CollegeSource Online is a subscription service that provides
access to CollegeSource's archive of PDF digital college course
catalogs.  The product is available to users who have a paid
subscription.  Users can also download a free trial and gain
access to up to three PDF catalogs.  Pl.'s Resp. to Def.'s Mot.
for Summ. J. ("Pl.'s Resp.") 8; Kerry Cooper Dep. ("Cooper Dep.")
108:22-109:4, Aug. 23, 2011 (D. Ex. 13); D. Exs. 15-16.

TES is an online database of courses and other course
equivalency-related data culled from CollegeSource's library of
course catalogs.  It is also available by subscription.  It is
primarily marketed to institutions seeking to facilitate the
transfer of credits from one school to another.  Am. Compl. ¶¶
24-25; Pl.'s Resp. 8; Tr. Prelim. Inj. Hr'g 22:2-10.

Finally, CataLink is a hyperlink service developed to
assist schools in distributing course catalogs efficiently.
CollegeSource provides subscribing schools with a URL hyperlink
to CollegeSource's archive of that school's digital course
catalogs, which can then be inserted and displayed on the

---

[2] "D. Ex." numbers refer to exhibits in the Consolidated
Appendix of Exhibits to AcademyOne's Memorandum in Support of
Summary Judgment.

school's home page.  When an interested user seeks to browse past catalog titles, he clicks on the CataLink and is brought to CollegeSource's domain.  Expert Report of Paul Lewis at 15, Dec. 21, 2011 ("Lewis Report") (D. Ex. 22); Stanley Novak Dep. ("Novak Dep.") 82:20-83:11, Aug. 24, 2011 (D. Ex. 6).

Unlike CollegeSource Online and TES, CataLink is not a subscriber service.  Users are transported to CollegeSource's website with no notification that they were leaving the school's Internet domain.  Jessica Ybarra Dep. ("Ybarra Dep.") 33:8-36:5, Aug. 26, 2011 (D. Ex. 23); Cooper Dep. 84:16-22 (D. Ex. 13); Lewis Report 10-17 (D. Ex. 22).

    2.  AcademyOne

The defendant AcademyOne was founded around 2006 with the objective to build administrative systems for schools and to reduce costs associated with student transfers.  AcademyOne has since developed two products: the Course Equivalency Management Center ("CEMC") and the National Course Atlas.  CEMC allows users, mostly faculty, to evaluate academic courses and curriculum at different institutions to make decisions on credit equivalency.  The National Course Atlas is a database of current course information from roughly 4,000 colleges.  Tr. Prelim. Inj. Hr'g 114:3-4, 115:2-5, 119:3-8, 121:14-19; D. Ex. 2 at 2.

B.    <u>The Parties' Course Catalog Collections</u>

1.    <u>CollegeSource's Collection Methods</u>

CollegeSource derived its first set of electronic college course catalogs through CGF in 2004, when CGF transferred its assets to CollegeSource as part of a settlement.  D. Ex. 10; Am. Compl. ¶ 23.  Now, CollegeSource repopulates its course catalogs on a yearly basis.  It acquires its collection of college course catalogs by contacting individual colleges by email or telephone and requesting copies of their catalogs.  The colleges then provide the catalog, either in electronic or paper form.  If the catalog is in electronic form, CollegeSource processes it, converts it to PDF format, and adds it to its database.  If the catalog is in paper form, CollegeSource scans it and processes it with optical character recognition software to convert it to PDF format.  D. Ex. 17; Tr. Prelim. Inj. Hr'g 49:21-22, 78:1-25, 79:1-9; Novak Dep. 33:10-13, 34:21-35:9, 39:2-40:10 (D. Ex. 6).

Course data is also extracted and placed in the TES course database, and the entire PDF catalog is placed in the CollegeSource Online database.  Selected catalogs are also made available via the CataLink system.  Pl.'s Resp. 7, Tr. Prelim. Inj. Hr'g Novak Test. 67:12-68:1, 75:21-23, 78:18-79:9.

Finally, CollegeSource inserts a uniform cover page (or "splash page") which includes the CollegeSource logo on each

catalog it converts to PDF format.  CollegeSource tags the data
both on the cover page and throughout the rest of the document.
Pl.'s Resp. 7-8; Tr. Prelim. Inj. Hr'g 32:7-11, 49:23-50:1.


    2.    <u>CollegeSource's Copyright Notices and Subscription</u>
        <u>Agreement</u>

    a.    <u>"Copyright & Disclaimer Information" Notices</u>

On the inside cover of each of its PDF college
catalogs, CollegeSource inserts a page entitled "Copyright &
Disclaimer Information."  The notice reads in relevant part:

> While CollegeSource, Inc. and Career Guidance
> Foundation provides information as a service to the
> public, copyright is retained on all digital catalogs.
> This means you may NOT:
> •    distribute the digital catalog files to others,
> •    "mirror" or include this material on an internet
>     (or intranet) server, or
> •    modify or re-use the files
> without the express written consent of CollegeSource,
> Inc. and Career Guidance Foundation and the appropriate
> school.

D. Ex. 26 at 3; Tr. Prelim. Inj. Hr'g 32:22-24.

In addition, CollegeSource's website contains a
"Copyright and Disclaimer" hyperlink in the lower left-hand
corner. The page accessed by this link contains language
substantively identical to that of the "Copyright & Disclaimer
Information" page in the PDF catalogs.  D. Exs. 34, 36.

6

              b.   <u>Subscription Agreement</u>

          CollegeSource also has a subscription agreement for its

CollegeSource Online and TES services.  To access subscriber-only

services on CollegeSource Online and TES, a user must accept the

terms of the subscription agreement.[3]  Troy Holaday Dep.

_____

          [3] This agreement stipulates, in relevant part:

"This Subscriber Agreement and Terms of Use govern your use of
CollegeSource Online, TES, and, unless other terms and conditions
expressly govern, **any other electronic services from
CollegeSource, Inc.** that may be made available from time to time
(each, a "Service", and collectively the "Services").

To the extent you have access to, or are using, a Service without
having both completed CollegeSource, Inc.'s registration process,
you are hereby notified that your continued use of a Service is
nevertheless subject to the terms and conditions of this
Agreement.
                        *  *  *  *
LIMITATIONS ON USE.
                        *  *  *  *
b.   The text, graphics, images, video, design, course
     description data, pdf college catalogs, information,
     organization, compilation, look and feel, advertising and
     all other protectable intellectual property, and all
     improvements, suggestions, and derivations thereto and
     thereof (collectively, the "Content") available through the
     Services is CollegeSource, Inc.'s property and is protected
     by copyright and other intellectual property laws.  Unless
     you have CollegeSource, Inc.'s written consent, **you may not
     sell, publish, broadcast, distribute, retransmit the
     information obtained through any Service**, or otherwise
     provide access to the Content received through the Services
     to anyone, including, if applicable, your fellow students or
     employees . . . .

c.   You agree not to rearrange or modify the Content.  **You agree
     not to create abstracts from, scrape or display data from
     the Content for use on another web site or service.**  You
     agree not to post any of the Content from the Services to
     weblogs, newsgroups, mail lists or electronic bulletin
     boards, without CollegeSource, Inc.'s written consent.  To

                              7

("Holaday Dep. III") 254:1-255:25, Sep. 27, 2011 (D. Ex. 14).

Such agreements can be accessed by a user in two manners.  First, a user seeking to log in encounters a sign-in box.  Within the sign-in box is the following language: "By signing in above, I agree to be bound by the terms of the . . . Subscription Agreement."  The box includes a link to this agreement.  Second, when the user attempts to access a course catalog using CollegeSource Online or TES, he also encounters a pop-up submission form to apply for a free trial.  In the submission form, there is a shortened version of the agreement and a link to the complete agreement.  D. Ex. 33; Troy Holaday Dep. ("Holaday Dep. I") 87:1-16, Aug. 25, 2011 (D. Ex. 46).

In contrast, when a user accesses a course catalog via a CataLink placed on a college's website, there are neither links to CollegeSource's Copyright and Disclaimer notice nor to its subscription agreement.  However, the Copyright and Disclaimer page is still included in the course catalog.  Lewis Report at 17 (screenshot of CataLink page) (D. Ex. 22).

---

request consent for this and other matters, please contact CollegeSource Customer Service.

\* \* \* \*

e.    You agree not to use the Services for any unlawful or unauthorized purpose.  ***CollegeSource, Inc. reserves the right to terminate or restrict your access to a Service*** if, in its opinion, your use of the Service does or may violate any laws, regulations or rulings, infringe upon another person's rights or violate the terms of this Agreement."

D. Ex. 41 (emphasis added).

2.   <u>AcademyOne Begins Collecting Its Course Catalog</u>

Because both of its products require course data, AcademyOne began a process to electronically gather course descriptions in 2008.  In order to obtain the course catalog data needed to run their services, AcademyOne first made several attempts to license CollegeSource's database.  However, CollegeSource denied its requests.  Tr. Prelim. Inj. Hr'g Stanley Test. 5:7-6:13 (D. Ex. 56); Tr. Prelim. Inj. Hr'g 60:2-3; Cooper Decl. ¶ 13 (ECF No. 185).

Thereafter, AcademyOne turned to the Chinese company Beijing Zhongtian-Noah Sports Science Co., Ltd. ("Noah") to retrieve the data.  AcademyOne hired Noah to pull PDF or HTML college catalogs directly from the college websites.  The agreement between the parties stipulated that AcademyOne would provide Noah with a list of links to online catalogs and that Noah would compile the course information into a single course database. (D. Ex. 58 at ex. A).

Approximately half of the 4,000 schools targeted by Noah posted their course catalogs in PDF format, which had to be converted and processed before being copied as text, or "scraped," into AcademyOne's database.  To collect the PDF course catalogs, Noah downloaded over 18,000 PDF files.  Tr. Prelim. Inj. Hr'g Stanley Test. 7:21-22 (D. Ex. 56); Stanley Decl. ¶ 9, (D. Ex. 59); Moldoff Decl. ("Moldoff Decl. II") ¶ 13, Jan. 5, 2011 (D. Ex. 60).

9

Initially, AcademyOne provided Noah the URLs at which to find the college catalogs.  Some of these schools utilized CollegeSource's CataLink service.  Noah eventually took over the task of locating the URLs based on a list of accredited colleges provided by AcademyOne.  Lin Zhou Dep., July 30, 2009, 83:11-13 (D. Ex. 62); Def.'s Mem. Supp. Summ. J. ("Def. Mot.") at 21; D. Ex. 65; Lin Zhou Dep., Oct. 11, 2011, 37:11-24 (D. Ex. 66).

There is evidence that between 2005 and 2007, several AcademyOne employees registered for free trial subscriptions to CollegeSource Online.  These free trials allowed for a limited number of course catalog downloads.  D. Exs. 109-10.

### 3. CollegeSource Finds Copies of Its PDF Catalogs on AcademyOne's Websites

In early 2007, AcademyOne launched its websites, which provided free access to its course description database.  This included around 2,000 of the 18,000 PDF documents that Noah had collected.  David Moldoff Dep. 52:15-53:17, 90:14-19, Mar. 20, 2009 (D. Ex. 67); Tr. Prelim. Inj. Hr'g 123:16-20.

Soon thereafter, CollegeSource's CEO, Kerry Cooper, discovered that some of the PDF documents posted by AcademyOne had been copied from CollegeSource servers.  CollegeSource was able to determine the identity of the documents because they included, on page two, CollegeSource's Copyright and Disclaimer Information page.  Cooper and other CollegeSource employees then

10

spent a full workday identifying around 680 CollegeSource course catalogs located on AcademyOne's website.  Tr. Prelim. Inj. Hr'g 31:21-32:19, 35:21-36:13.  Noah later reported to AcademyOne that out of the over 18,000 PDF documents it provided, 783 were "CollegeSource PDFs."  D. Exs. 71-72.

The 783 "CollegeSource PDFs" had been obtained by Noah through CollegeSource's CataLink service.  CataLink is a "hyperlink" archival service provided to subscribing schools and universities with which educational institutions can copy a link to CollegeSource's PDF version of their catalog and post it to their own websites.  Over 1,700 PDF course catalogs containing the name "CollegeSource" are publicly available on college websites.[4]  Novak Dep. 77:7-80:12 (D. Ex. 6); Lewis Report at 8-9 (D. Ex. 22); D. Exs. 47, 51-54.

In 2008, CollegeSource hired a computer expert, Michael Bandemer, to examine and analyze whether AcademyOne had improperly used electronically stored intellectual property of CollegeSource.  Bandemer confirmed that some PDFs posted on AcademyOne's website were identifiable as "encrypted [CollegeSource] PDF data."  Expert Report of Michael R. Bandemer ("Bandemer Report") 2, 4 (D. Ex. 91).

_____

[4] After 2009, only institutions which were subscribers to CollegeSource Online had privilege to a CataLink hyperlink. Prior to 2009, however, *all* institutions could do the same; CollegeSource was aware of these practices and permitted them. Novak Dep. 77:7-78:23, 79:4-80:12 (D. Ex. 6); Lewis Report at 8-9; D. Exs. 47, 51-54.

CollegeSource has not identified any signs of a firewall breach of CollegeSource's servers or any unusually large downloads of CollegeSource data.  Ybarra Dep. 19:8-11, 40:13-18 (D. Ex. 23).

### 4. The Cease and Desist Letter and Its Aftermath

On April 23, 2007, Kerry Cooper, the CEO of CollegeSource, hand-delivered a cease and desist letter to AcademyOne.  This letter asserted that there were "approximately 700 instances" of "literal copying and display of the CollegeSource Materials by AcademyOne."  CollegeSource claimed that AcademyOne willfully infringed its copyright, violated the Lanham Act, and violated the California Business and Professions Code § 17200.  The letter demanded that AcademyOne remove all CollegeSource PDF catalogs from its websites and servers.  Tr. Prelim. Inj. Hr'g 36:22-37:1; Moldoff Decl. II ¶ 19, Ex. 1 (D. Ex. 60).

Upon receiving the cease and desist letter, AcademyOne disabled the links on its website which allowed access to all PDF catalogs and initiated an internal investigation regarding CollegeSource's allegations.  During the investigation, the PDFs were not linked onto the website, but the catalogs remained on AcademyOne's servers, meaning anyone who had saved the URL for a specific catalog could still access it.  Tr. Prelim. Inj. Hr'g 39:13-17, 125:12-21; D. Exs. 71-72.

Following the investigation, AcademyOne removed all PDF catalogs from its servers.  At that time, AcademyOne did not delete the course descriptions "scraped," or copied, from the CollegeSource PDFs.  In January 2011, AcademyOne initiated a new method of repopulating its databases in a manner which did not involve Noah's PDF files.  Thus, it removed at that time all course descriptions derived from PDF catalogs (including catalogs not created by CollegeSource) from its database.  Tr. Prelim. Inj. Hr'g 126:10-16, 127:15-24; Moldoff Decl.("Moldoff Decl. III") ¶ 14, Feb. 27, 2012 (D. Ex. 3).

### 5. Damages Incurred by CollegeSource

CollegeSource embarked on a number of steps upon its discovery of AcademyOne's actions in early 2007.  First, CollegeSource initiated an internal investigation of AcademyOne's websites, which involved many employees' working hours. Tr. Prelim. Inj. Hr'g 31:21-32:19.  In addition, CollegeSource hired a computer expert, Michael Bandemer, to analyze the full scope of AcademyOne's actions.  Finally, CollegeSource incurred costs by implementing increased security measures on their catalogs, such as "seeding," "salting," and "watermarking."  These costs were well in excess of $5,000.  Cooper Decl. ¶ 16, (ECF No. 185).

### C.   AcademyOne's AdWords

Beginning in 2007, AcademyOne purchased the terms

"college," "college source," "career guidance," and "career guidance foundation" from several Internet search engines such as Google.  This form of Internet advertising, known as "AdWords," presents advertisements as "sponsored links" or "sponsored results" in addition to the standard search results.  Thus, a user who entered the search terms purchased by the advertiser would, in addition to the normal search results, be presented with an ad for the advertiser's website.  Moldoff Decl. III ¶¶ 16, 18 (D. Ex. 3).

Here, AcademyOne's advertisements are titled with a key phrase such as "College Transfer Help" or "Find Transfer Information."  It identifies its website "collegetransfer.net," not AcademyOne.  The display of the advertisements vary depending on the Internet service provider.  On AOL, for example, the links are listed above the normal results, shaded a different color from the normal search results, and listed as a "Sponsored Link." On Google, the links are listed to the right of the normal results under the banner "Sponsored Links."  On Ask.com, the advertisement is nestled within the normal results and under a small "Sponsored Results" banner.  Troy Holaday Decl. ("Holaday Decl. II") Ex. I, Apr. 5, 2012 (ECF No. 186-9).

CollegeSource and its predecessor CGF have continuously used the "CAREER GUIDANCE FOUNDATION" name and marks in advertising and in general commerce since 1980.  They have used "COLLEGESOURCE" continuously since 1994.  Finally, CollegeSource

14

owns all title and interest to the mark "CollegeSource."   Cooper
Decl. ¶¶ 17-18 (ECF No. 185); Holaday Decl. II, Ex. H (ECF No.
186-9).


       D.    <u>AcademyOne's Trademark in CollegeTransfer.net</u>

          AcademyOne filed an application with the U.S. Patent
and Trademark Office (USPTO) to register "collegetransfer.net" as
a service mark on July 3, 2009, and thereafter requested that the
mark be moved to the Supplemental Register.   The mark was
registered on the Supplemental Register on May 25, 2010.   It has
not yet been registered on the Principal Register.   Am. Compl.
267, 279, 284; Papaefthimiou Decl. Ex. 23, 26 (ECF No. 187-21,
23).

          In its application to the USPTO, AcademyOne represented
that it first used collegetransfer.net in commerce on December 1,
2005.  However, there is evidence in the record to suggest that
the correct date of its first use was sometime after March 2007.
Papaefthimiou Decl. Ex. 4 ¶ 12 (ECF No. 187-4).   In addition,
AcademyOne did not inform the USPTO about an Eastern District of
Pennsylvania decision which held that CollegeSource did not
infringe on the collegetransfer.net trademark with its own
website, collegetransfer.com.  <u>AcademyOne, Inc. v. CollegeSource,</u>
<u>Inc.</u>, No. 08-5707, 2009 WL 5184491 (E.D. Pa. Dec. 21, 2009).
CollegeSource has argued that due to AcademyOne's false
statements and omissions, AcademyOne's trademark over

"collegetransfer.net" should be cancelled.  Pl.'s Resp. 118-19.

E.    <u>AcademyOne's Letters and Database Representations</u>

Finally, CollegeSource's false advertising claim stems from two sets of public statements made by AcademyOne: its correspondences to public colleges and representations made on its website respecting the accuracy of its course database.[5]

1.    <u>Letters to Public Colleges Under State Freedom of Information Acts</u>

From January through July 2010, Mr. David Moldoff, AcademyOne's CEO, sent letters to a number of public colleges requesting information under state freedom of information or "sunshine" laws.  In these letters, Mr. Moldoff informed the institutions that CollegeSource had filed "copyright claims" in federal district court.  He requested copies of correspondences between the institution and CollegeSource relating to any "ownership and control [by CollegeSource] of your Institution's digital catalog and the course descriptions therein."  The letter also states that "CollegeSource claims control of the digital catlogs that they collect, even if it resides on your website."  Finally, it states that CollegeSource's assertions of ownership

---

[5]  Plaintiff has withdrawn the third portion of the false advertising claim, regarding the defendant's submission to the South Carolina Department of Education to bid for its course articulation and transfer service.  Pl.'s Resp. 126.

"attempt to preclude AcademyOne and other software providers from providing automated student transfer systems . . . ."[6]  D. Exs. 95-96.

Mr. Moldoff, who is not a lawyer, has testified that he used the term "copyright claim" generally and not as a reference to a specific cause of action.  He also testified that he made his statement regarding CollegeSource's actions against AcademyOne and other software providers as a result of a statement made by CGF's founder, Harry Cooper.  Mr. Moldoff had

---

[6] The statements at issue are as follows:

"AcademyOne is making this request as a result of CollegeSource's copyright claims filed with the United States District Court for the Eastern District of Pennsylvania in July, 2010 whereby CollegeSource is claiming ownership and control of your institution's digital catalog and the course descriptions contained within, whereby restricting the use of your academic content sourced from the digital catalog that was designed to support academic purposes by other institutions and prospective students.  CollegeSource's assertations attempt to preclude AcademyOne and other software providers from providing automated student transfer systems that may enable prior learning assessment, credit recommendation methods and articulation decisions using course content sourced from digital catalogs CollegeSource has tagged.
                    * * * *
AcademyOne's CollegeTransfer.Net enables students to compile an academic history referencing course data and facilitates course comparability projects across institutions and their academic departments.
                    * * * *
CollegeTransfer.Net and CourseAtlas.com are sites where students can freely find what courses transfer in and out between institutions throughout the United States as more and more institutions are publishing their course level data with our service."

D. Ex. 96.

been informed that Mr. Cooper stated to members of the industry that CollegeSource intended to bring suit against any other developers who copied course descriptions or engaged in similar conduct.  Tr. Prelim. Inj. Hr'g 132:17-136:4.

As a result of Mr. Moldoff's letters, some schools contacted CollegeSource and expressed concern.  One of CollegeSource's clients pulled its catalogs from CollegeSource's databases.  Tr. Prelim. Inj. Hr'g 52:7-9, 53:4-14.

### 2.   AcademyOne's Database Representations

On one of AcademyOne's websites, courseatlas.com, AcademyOne makes several statements regarding its course databases, including that it is "published annually" with "current course offerings", is the "most comprehensive database of current course offerings possible", is not "outdated", and is "reliable, accurate, and up-to-date."  Papaefthimiou Decl. Exs. 28-30, Apr. 6, 2012 (ECF No. 187-26,28).

CollegeSource claims that these statements are false or misleading.  It points to an entry for Bergen Community College which appears to be derived from a 2006-2007 catalog, not the current catalog.  Pl.'s Resp. 121-22; Papaefthimiou Decl. Ex. 31 (ECF No. 187-29).

## II.  Procedural History

On July 20, 2010, eleven months after a parallel

18

California action was dismissed,[7] CollegeSource filed this action in the Eastern District of Pennsylvania and moved for a temporary restraining order to preserve evidence on AcademyOne's computers. On August 3, 2010, the Court denied the motion and instructed both parties not to destroy any potentially relevant information. CollegeSource thereinafter filed an Amended Complaint on October 19, 2010, which AcademyOne moved to dismiss in part.  The parties

---

[7] CollegeSource initiated its litigation in the Southern District of California in October 2008. CollegeSource, Inc. v. AcademyOne, Inc., No. 08-1987 (S.D. Cal.) ("California Action"). In August 2009, the California Action district court dismissed that case for lack of personal jurisdiction, and CollegeSource filed a timely appeal. Id. at 2009 WL 2705426 (S.D. Cal. Aug. 24, 2009). While the issue was pending appeal, CollegeSource filed the instant case in July 2010.  After consultation with both parties, this Court agreed to move forward with the instant case with the understanding and agreement that CollegeSource would continue to litigate regardless of the outcome of the California Action appeal.  The parties thereinafter engaged in extensive motion practice.

However, on August 8, 2011, the Ninth Circuit reversed the district court's earlier dismissal in the California Action, and on September 1, 2011, CollegeSource moved to dismiss, transfer, or stay the instant lawsuit pending resolution in California. The Court denied the motion on October 28, 2011.  It held that departure from the first-filed rule was warranted in this situation because the instant case had already "developed considerably further than in the first-filed California Action" and the Court had developed familiarity with the facts and legal issues surrounding the case.  Moreover, to allow otherwise would be contrary to principles of fairness and comity, resulting in a waste of judicial resources. CollegeSource, Inc. v. AcademyOne, Inc., No. 10-3542 (E.D. Pa.) (ECF No. 133).

The California Action is currently stayed pending resolution of the instant case.  The plaintiff has appealed the stay order and it is currently pending before the Ninth Circuit Court of Appeals. CollegeSource, Inc. v. AcademyOne, Inc., No. 12-55013 (9th Cir.).

engaged in briefing on a number of issues, including the plaintiff's RICO claims (Counts 1 & 2 of the Amended Complaint).

On December 6, 2010, CollegeSource moved for a preliminary injunction. At a day-long evidentiary hearing and separate oral argument, the Court heard testimony from five witnesses and received 92 exhibits as evidence. The parties engaged in extensive briefing of the legal issues and submitted proposed findings of fact and conclusions of law. Ultimately, the Court denied the motion because CollegeSource did not show that, absent an injunction, it would suffer irreparable harm on its breach of contract and unjust enrichment claims. The Court also held that CollegeSource had not demonstrated a likelihood of success on its false advertising claim under the Lanham Act.

On May 19, 2011, the Court granted Defendants' motion to dismiss the RICO claims, dismissed David Moldoff from the case, and issued a scheduling order.

The parties proceeded with discovery beginning in June 2011. Expert discovery commenced in October 2011. CollegeSource produced two affirmative expert reports and AcademyOne served three rebuttal reports.

On February 27, 2012, AcademyOne moved for summary judgment on all remaining counts. The parties engaged in substantial briefing and the Court heard oral argument on the motion on June 13, 2012.

On September 21, 2012, months after discovery had ended and as the Court was finalizing its decision on the summary judgment motion, CollegeSource filed a motion for leave to supplement its opposition to the summary judgment motion and to reopen discovery.  The plaintiff argued that it had used a search vehicle called "Agent Ransack" to uncover "newly discovered evidence" relating to the defendant's Apple Server and the plaintiff's server logs.  After holding a telephone conference to discuss the parties' arguments, the Court denied the plaintiff's motion.  Given that the Agent Ransack software program was created in 2000 and has been freely available on the Internet throughout the course of this litigation, the Court reasoned that the plaintiff did not offer a persuasive reason why the search vehicle could not have been utilized during the proper time for discovery.

III. <u>Analysis</u>

AcademyOne is entitled to summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making its determination, the Court must consider the evidence in the light most favorable to the nonmoving party.  <u>Sheridan v. NGK Metals Corp.</u>, 609 F.3d 239, 251 n.12 (3d Cir. 2010).  The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact.  <u>Celotex Corp. v. Catrett</u>,

477 U.S. 317, 323 (1986).  An issue is genuine if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party; it is material if it may affect the outcome of the suit under governing law.  Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986).

AcademyOne has moved for summary judgment on Counts 3-9 of the Amended Complaint: Violation of the U.S. Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030); state law claims of Breach of Contract and Unjust Enrichment; Trademark Infringement under U.S. Lanham Act (15 U.S.C. § 1114); Unfair Competition under U.S. Lanham Act (15 U.S.C. § 1125(a)); Declaration of Trademark Invalidity; and False Advertising under U.S. Lanham Act (15 U.S.C. § 1125(a)).  The Court will begin by addressing the two state law claims, breach of contract and unjust enrichment. It will then address the remaining claims in turn.

A.   The Plaintiff's Breach of Contract Claim

1.   Preemption Argument

The defendant argues that the plaintiff's breach of contract claim is equivalent to the rights created by the Copyright Act of 1976 and should be preempted.  The Court finds no preemption with respect to the breach of contract claim.

Section 301(a) of the Copyright Act preempts state law claims that are equivalent to the rights created by federal copyright.  17 U.S.C. § 301(a).  In the Third Circuit, "if a

state cause of action requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display, then . . . federal law will not preempt the state action." Dun and Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 217 (3d Cir. 2002) (quotations omitted).  This circuit has not decided whether breach of contract claims per se contain an extra element.

Several extra elements arise in CollegeSource's breach of contract claim.  First, a breach of contract claim involves the existence of a contract or agreement.  E.g., MCS Services, Inc. v. Raleigh Johnsen, No. 01-4430, 2002 WL 32348500, at *6 (E.D. Pa. Aug. 13, 2002).  Under Pennsylvania law, the plaintiff must prove offer, acceptance, and consideration to establish that a contract exists.  E.g., Schreiber v. Olan Mills, 426 Pa. Super. 537, 541 (1993).  Such elements are not at issue in copyright.  1 Melville B. Nimmer & David Nimmer, **Nimmer on Copyright** § 1.01[B][1][a] (2002) ("Without a promise there is no contract, while a promise on the part of one who engages in unlicensed reproduction or distribution is not required in order to constitute him a copyright infringer.").

Second, copyright and contract law differ in the type of right resulting from the court's judgment.  Because contract is *in personam* and copyright is *in rem*, a judgment on the basis of contract law will impact a third party's rights differently.

23

E.g., Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc., 210 F. Supp. 2d 552, 566 (D.N.J. 2002) (citing ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1454 (7th Cir. 1996)).  In this case, any decision by this Court regarding AcademyOne's breach of contract will not affect "the options of persons who are strangers to the author."  ProCD, 86 F.3d at 1454.

Some courts have held that a breach of contract by itself is not enough to avoid preemption.  "If the promise amounts only to a promise to refrain from reproducing, performing, distributing or displaying the work, then the contract claim is preempted."  Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 457 (6th Cir. 2001).  At oral argument, however, CollegeSource stated that its claim relates to "defendant's promise to make only personal use" of the documents.  Tr. Hr'g Mot. Summ. J. 6/13/12 ("6/13/12 Hr'g Tr.") 56:17-22.  Indeed, the license discusses the user's obligation to print documents only for personal use.  D. Ex. 26.  This is sufficiently distinct from copyright law to pass muster.  E.g., Video Pipeline, 210 F. Supp. 2d at 567 (holding that a contract's regulation on permitted use, there the license's regulation that defendants must display a trademark on its websites, was sufficient to establish an extra element).

The plaintiff's cause of action alleges three potential extra elements distinct from those analyzed for rights derived from the Copyright Act.  Therefore, the Court finds no preemption and proceeds with a breach of contract analysis.

24

There are two separate claims at issue: the "Copyright and Disclaimer" notice, which is located on the inside cover of the PDF course catalogs as well as on the website itself, and the subscription agreement, which is present when a user seeks access to subscriber-only materials.

    2.   <u>CollegeSource's "Copyright and Disclaimer" Notices</u>

Summary judgment is granted in favor of AcademyOne on the breach of contract claim stemming from the "Copyright and Disclaimer" notices contained on CollegeSource's PDF catalogs and website.

Under Pennsylvania law, contract formation requires that the parties "1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity."  <u>Weaverton Transp. Leasing, Inc. v. Moran</u>, 834 A.2d 1169, 1172 (Pa. Super. 2003).  To have mutual understanding, both parties must be aware of the contractual nature of the document.  <u>Zukoski v. Balt. & Ohio R.R. Co.</u>, 315 F.2d 622, 625 (3d Cir. 1962).

The "Copyright and Disclaimer" notice is located on the second page of the PDF catalogs and on the CollegeSource website itself.  It states that CollegeSource retains a copyright on all digital catalogs and that, as a result of the copyright, users are prohibited from using the document in certain manners.  D. Exs. 26, 36.  It does not contain any of the essential elements

of contract formation.  It does not state what exactly is being offered; that users should agree to its terms in a particular manner; or that users will obtain any sort of consideration in exchange for their assent.  See, e.g., Stelmack v. Glen Alden Coal Co., 14 A.2d 127, 128-29 (Pa. 1940).

Moreover, it is not obvious that the "Copyright and Disclaimer" notices are documents based in contract as opposed to copyright law.  First, the title of the documents, "Copyright and Disclaimer Information," suggests that they serve to inform the user of rights under the Copyright Act.  D. Exs. 26, 36.  The language in the actual documents reinforces this inference.  The fact that the notices make reference to copyright ownership to declare limitations on user rights would suggest that the restrictions are grounded in copyright law, not contract law.  A reasonable party reading the documents would not be aware of the contractual nature of the documents.

Because no contract was ever formed by the notice, AcademyOne could not have breached any such contract.  Summary judgment is granted in favor of AcademyOne on the breach of contract claim stemming from these notices.

### 3.  CollegeSource's Subscription Agreement

Summary judgment is granted in favor of AcademyOne with respect to the breach of contract claim regarding the subscription agreement.  CollegeSource has not provided any

evidence demonstrating that AcademyOne breached the subscription agreement by improperly obtaining CollegeSource data through its subscriptions.

The subscription agreement is encountered by users seeking to browse CollegeSource's subscriber-only content. Before users can browse such content, they confront a link to the subscription agreement accompanied by a box that states "by signing in above, I agree to be bound by the terms of the . . . Subscription Agreement." D. Ex. 33. A user cannot access the subscriber-only content without signing in, either through a paid or free trial subscription.

From this box, users may opt to click on the link to the subscription agreement, the relevant terms of which state the following: "The subscriber agreement and terms of use govern your use of CollegeSource on-line TES, and unless other terms and conditions expressly govern, *any other electronic service* from CollegeSource, Inc. that may be available from time to time." D. Ex. 41 (emphasis added). Among other restrictions, the agreement includes a provision prohibiting non-personal use of the documents.

The subscription agreement is a "browsewrap agreement," which some courts have held to be an enforceable contract. See, e.g., Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 406 (2d Cir. 2004). It explicitly states that it is an agreement between CollegeSource and the user. In addition, it provides a

27

designated manner in which the user can manifest assent.  There
is also evidence that in 2005, several AcademyOne employees
registered for "demo" subscriptions with CollegeSource and were
given the option to view the subscription's terms.  D. Exs. 109-
10.

However, CollegeSource has not presented any evidence
demonstrating that AcademyOne obtained CollegeSource data in
breach of the subscription agreement's terms of use.  There is no
evidence that AcademyOne's actions as a subscriber (that is,
while logged in) violated the subscription's terms.  Def. Mot. at
52.

CollegeSource relies instead on the argument that the
scope of the subscription agreement extends beyond the actions of
AcademyOne while logged in as a subscriber and includes
AcademyOne's subsequent access of CollegeSource documents through
CataLink.  In short, CollegeSource argues that the term
"electronic service" should cover CataLink, and AcademyOne argues
that it should not.

According to CollegeSource, the plain language of the
subscription agreement establishes that the contract's terms
extend beyond the subscription itself.  6/13/12 Hr'g Tr. 40:20-
22.  The subscription agreement gives notice to subscribers that
restrictions apply to all of CollegeSource's "other electronic
services."  Pl.'s Resp. 35.  CataLink is an electronic service

28

because it is comprised of "CollegeSource's information from
CollegeSource's server."  6/13/12 Hr'g Tr. 42:19-21.

    In contract interpretation, determining the intent of
the parties is paramount.  <u>Compass Tech., Inc. v. Tseng Lab.,
Inc.</u>, 71 F.3d 1125, 1131 (3d Cir. 1995).  To determine the
intention of the parties, the court shall "adopt an
interpretation . . . which under all circumstances ascribes the
most reasonable, probable, and natural conduct of the parties."
<u>Glenn Distrib. Corp. v. Carlisle Plastics, Inc.</u>, 297 F.3d 294,
301 n.4 (3d Cir. 2002) (internal citations omitted).

    The Court is not persuaded that the subscription
agreement intends to cover CataLink as an electronic service.
The term "Service" is used multiple times in the agreement, and
some of these usages are not applicable to CataLink.  For
example, Paragraph 3.a. restricts subscribers from using the same
username at the same time to log in to "Services"; CataLink,
however, has no subscriber username restrictions.  D. Ex. 41.  In
addition, Paragraph 3.e. states that CollegeSource can "terminate
or restrict [a user's] access to a Service."  <u>Id.</u>  In the first
instance, it is unclear whether CollegeSource is even able to
cause a user's CataLink privileges to be terminated. Furthermore,
CataLink is designed to be publicly accessible.  An at-will
termination is "facially inconsistent with the public access that
CollegeSource provides to catalogs through CataLink."  Def. R.
Br. to Mot. Summ. J. 9 ("Def. R. Br.").

From the position of the subscriber, it is difficult to imagine that AcademyOne intended to bind itself to restrictions to use in the CataLink context.  In contrast to the other services provided by CollegeSource, which serve a subscriber directly, a user accesses a CataLink-based document through a third party's website, which then redirects the user to a CollegeSource browser.  Lewis Report 10-12 (D. Ex. 22).  It is possible that a typical user may never even know he visited a CataLink weblink.  Given the attenuation of CataLink usage to a subscription agreement, it would not be "natural" to construe the contract to apply to such usage.

If CollegeSource had intended its subscriber agreement to include CataLink, it did not make its intention clear. Reading the contract as a whole, and reading the terms as consistently as possible, "Services" should not include the CataLink service.  The Court grants AcademyOne's Motion for Summary Judgment as to the breach of contract claim regarding the subscription agreement.


B.   The Plaintiff's Unjust Enrichment Claim

Unlike CollegeSource's breach of contract claim, its unjust enrichment claim is equivalent to the rights created by the Copyright Act because it does not state an extra element beyond those at issue in federal copyright law.  Dun and Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307

30

F.3d 197, 217 (3d Cir. 2002).  The Court holds that the unjust enrichment claim is preempted by the Copyright Act.

The Third Circuit has not yet ruled on whether an additional element exists in unjust enrichment claims.  The circuits to consider the issue have held that there is no "additional element" in unjust enrichment claims stemming from acts that would in and of themselves have violated the Copyright Act.  E.g., R.W. Beck, Inc. v. E3 Consulting, LLC, 577 F.3d 1133, 1149 (10th Cir. 2009); Tastefully Simple, Inc. v. Two Sisters Gourmet, L.L.C., 134 Fed. Appx. 1, 2005 WL 820606, *6, n. 3 (6th Cir. 2005); Summit Mach. Tool Mfg. Corp. v. Victor CNC Systems, Inc., 7 F.3d 1434, 1442 (9th Cir. 1993); see also Berry v. Deutsche Bank Trust Co. Americas, No. 07-cv-7634, 2008 WL 4694968 (S.D.N.Y. Oct.21, 2008), aff'd 378 Fed. Appx. 110, 2010 WL 2079914 (2d Cir. 2010).

Here, CollegeSource asserts that AcademyOne was unjustly enriched because it copied and displayed on its website course descriptions from CollegeSource catalogs, and in doing so derived a financial benefit.  Pl.'s Resp. 36; Am. Compl. ¶ 64-66. The exclusive right to copy and display copyrighted works is conferred by Section 106 of the Copyright Act.  See 17 U.S.C. § 106 (granting the copyright owner exclusive rights to "reproduce the copyrighted work in copies" and "display the copyrighted work publicly").  Thus, to the extent that the course descriptions are subject to copyright, then CollegeSource's claim of unjust

31

enrichment stems from acts that also violate the Copyright Act. E.g., <u>Curtin v. Star Editorial, Inc.</u>, 2 F. Supp. 2d 670, 675 (E.D. Pa. 1998) (preempting the plaintiff's unjust enrichment claim because "plaintiff asserts an exclusive right to and reimbursement for the use of his compilation of photographs").

The Court is not persuaded by the plaintiff's argument that the facts in this case differ substantially from those required to state a claim for copyright infringement.  The extra element of misrepresentation, or taking in an underhanded way, does not avoid preemption.  <u>See</u> <u>Profoot, Inc. v. MSD Consumer Care, Inc.</u>, No. 11-7079, 2012 WL 1231984, at *6 (D.N.J. Apr. 12, 2012).  Neither do allegations that the benefit conferred was in the form of money saved instead of actual profit.  <u>See</u> 1-1 **Nimmer on Copyright** § 1.01(B)(1)(h) (stating that a copyright infringer "always 'accepts' the benefit of the copyrighted work").  For these reasons, the Court finds that the unjust enrichment claim is preempted.

C.   <u>The Plaintiff's Computer Fraud and Abuse Act Claim</u>

CollegeSource asserts that AcademyOne's actions have breached the U.S. Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.  Because CollegeSource has not produced evidence of acts of unauthorized access, or access exceeding authorization, to CollegeSource computers, the Court grants summary judgment in favor of AcademyOne on this claim.

The CFAA is a federal criminal statute that prohibits seven activities related to unwelcome access or breach of protected computers.  Although it is primarily a criminal statute, the CFAA contains a civil enforcement provision:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B).

18 U.S.C. § 1030(g).  CollegeSource makes four claims under the CFAA: § 1030(a)(2)(C), § 1030(a)(4), § 1030 (a)(5)(B), and § 1030 (a)(5)(C).  Each claim revolves around the same set of facts as applied to different, but related, elements.  Two of the claims, § 1030(a)(5)(B) and § 1030 (a)(5)(C), require proof that the defendant accessed a protected computer *without authorization*; the other two, § 1030(a)(2)(C) and § 1030(a)(4), require proof that the defendant accessed a protected computer *without authorization or exceed[ing] authorized authority*.

The term "without authorization" is not defined in the CFAA and the Third Circuit has not issued an opinion on this issue.  The standard in other circuits is whether the access is "in any way related to [its] intended function."  <u>E.g.</u>, <u>United States v. Phillips</u>, 477 F.3d 215, 220 (5th Cir. 2007); <u>United States v. Morris</u>, 928 F.2d 504, 510 (2d Cir. 1991).  The term "exceeds authorized access" is defined by the CFAA as "access [of] a computer with authorization and to use such access to

33

obtain or alter information in the computer that the accesser is not entitled to obtain or alter." 18 U.S.C. § 1030(e)(6). Put another way, "[A] person who 'intentionally accesses a computer without authorization' . . . accesses a computer without any permission at all, while a person who 'exceeds authorized access' . . . has permission to access the computer, but accesses information on the computer that the person is not entitled to access." LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1133 (9th Cir. 2009).

CollegeSource alleges that AcademyOne accessed CollegeSource's protected computer to obtain college catalog PDF files off its server. CollegeSource does not specify which acts of access it refers to, but states that at the very least, "Defendant admits that it accessed CollegeSource's 'protected computer' to obtain CollegeSource's college catalog pdf files off of its servers through its Catalink service." Pl.'s Resp. 45. The record does not reflect any evidence of a breach of security or "hacking" by AcademyOne. Bandemer Report 4; Ybarra Dep. 19:8-11, 40:13-18 (D. Ex. 23). Nor is there evidence that AcademyOne's free trial subscriptions were used to download CollegeSource documents for commercial purposes. The Court thus will analyze the CFAA claims with respect to websites linked through the CataLink service only.

Accordingly, the Court holds that because the documents in issue were available to the general public, AcademyOne did not

access them without authorization.  Moreover, because AcademyOne
was under no obligation to abide by any terms of use as to its
CataLink access, it did not exceed authorized access.

>  1.  § 1030(a)(5)(B) and § 1030 (a)(5)(C): "Without
>     Authorization" Analysis

First, the Court finds that AcademyOne was authorized
to access the CataLink websites it and Noah visited in order to
obtain PDF course catalogs.  Because CataLink is available on the
Internet and does not require a password or individualized
access, any member of the public had authority to access the
information.  Lewis Report 10 (D. Ex. 22).  Moreover, the point
of the CataLink system is to help colleges provide public access
to their course catalogs.  The nature of CataLink thus grants all
parties authority to access catalogs.  See, e.g., Cvent, Inc. v.
Eventbrite, Inc., 739 F. Supp. 2d 927, 932 (E.D. Va. 2010).

CollegeSource has alleged that AcademyOne accessed
CollegeSource's websites in an unauthorized manner.
CollegeSource asserts that it would not have authorized
AcademyOne's access of the CataLink service "for the purpose of
competing with CollegeSource or other commercial purposes," and,
therefore, AcademyOne's actions were unauthorized.  Am. Compl. ¶
177.

CollegeSource's argument fails because it refers to
unauthorized *use*, not unauthorized *access*.  The CFAA protects

35

against unauthorized access rather than unauthorized use.
Integrated Waste Solutions v. Goverdhanam, No. 10-2155, 2010 WL
4910176, at *8 (E.D. Pa. Nov. 30, 2010); Grant Mfg. & Alloying,
Inc. v. McIlvain, No. 10-1029, 2011 WL 4467767, at *6 (E.D. Pa.
Sep. 23, 2011).  AcademyOne, as a member of the public, would
have had authorization if it had used the data for non-commercial
related purposes; by CollegeSource's account, it is only because
AcademyOne's *use* was inappropriate that it became unauthorized.
The argument is insufficient to support a CFAA claim.

        To violate § 1030(a)(5)(B), one must intentionally
access a protected computer without authorization, and as a
result recklessly cause damage or loss.  18 U.S.C. §
1030(a)(5)(B).  To violate § 1030(a)(5)(C), one must
intentionally access a protected computer without authorization,
and as a result cause damage or loss.  18 U.S.C. § 1030(a)(5)(C).
Because AcademyOne did not access CollegeSource websites without
authorization, summary judgment is granted in AcademyOne's favor
on these two claims.


        2.    § 1030(a)(2)(C) and § 1030(a)(4): "Exceeding
              Authorization" Analysis

        CollegeSource has also asserted claims under 18 U.S.C.
§ 1030(a)(2)(C) and § 1030(a)(4).  Under § 1030(a)(2)(C), a
person who "intentionally accesses a computer without
authorization or exceeds authorized access, and thereby obtains

information from any protected computer" is in violation of the
CFAA.  18 U.S.C. § 1030(a)(2)(C).  Under § 1030(a)(4), a person
who "knowingly and with intent to defraud, accesses a protected
computer without authorization, or exceeds authorized access, and
by means of such conduct furthers the intended fraud and obtains
anything of value [greater than $5000]" is also in violation of
the CFAA.  18 U.S.C. § 1030(a)(4).  Because AcademyOne did not
exceed authorization when it accessed CollegeSource course
catalog PDFs via CataLink, both claims are dismissed.

     CollegeSource argues that because AcademyOne violated
its "terms of use," its actions exceeded authorization.  Some
courts outside of this circuit have accepted the argument that a
website's terms of use can define authorized access for that
website.  E.g., United States v. Drew, 259 F.R.D. 449, 461-62
(C.D. Cal. 2009).  This argument does not help CollegeSource
here.  As discussed earlier in Part A.3, the copyright notice,
website terms of use, and subscription agreement do not bind
AcademyOne's actions with respect to CataLink.  Therefore,
AcademyOne did not access CollegeSource servers in a manner that
exceeds authorization, and summary judgment is granted in favor
of the defendant under 18 U.S.C. § 1030(a)(2)(C) and 1030(a)(4).


        3. Loss Analysis Under the CFAA
     Because CollegeSource's CFAA claim fails on the basis
of authorization, the Court need not analyze the statute's

remaining requirements.  Because the parties briefed the issue of loss under the CFAA, however, the Court notes that there is sufficient loss to establish standing in this case.

Under the CFAA, a plaintiff must establish "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" to establish standing.  18 U.S.C. § 1030(c)(4)(A)(i)(I).  The statute defines loss as "any reasonable cost to any victim."  18 U.S.C. § 1030(e)(11).

The Third Circuit has not interpreted the term "loss" under the CFAA.  Other appellate courts have characterized the definition as "broadly worded" and found that it "plainly contemplates . . . costs incurred as part of the response to a CFAA violation, including the investigation of an offense."  A.V. v. iParadigms, LLC, 562 F.3d 630, 646 (4th Cir. 2009).

Under this definition, CollegeSource's internal investigation of AcademyOne's websites, its hiring of a computer expert, and its subsequent security measures constitute loss under the CFAA because they are reasonable costs related to a breach of security.  AcademyOne argues that because these losses are not related to damage or interruption of a computer, they do not fall within the scope of CFAA's damages.  Def. Mot. 65.  This interpretation would eliminate many reasonable costs that would otherwise be recoverable and would conflict with the broad language of the statute.  The Court finds that loss has been established in the record here.  E.g., iParadigms, 562 F.3d at

38

645 (holding that remedial measures, including an investigation following a glitch in security systems, constituted loss under the CFAA); <u>SuccessFactors, Inc. v. Softscape, Inc.</u>, 544 F. Supp. 2d 975, 980-81 (N.D. Cal. 2008).

     D.    <u>The Plaintiff's Trademark Infringement and Unfair Competition Claims Under sU.S. Lanham Act</u>

CollegeSource asserts that AcademyOne's AdWord purchases, which included certain CollegeSource trademarks, is trademark infringement and unfair competition in violation of the Lanham Act.  Because the plaintiff has not proven that the defendant's use is likely to cause confusion, the Court grants summary judgment in favor of AcademyOne.

In order to prove trademark infringement and unfair competition under the Lanham Act, CollegeSource must prove: (1) it owns the "CollegeSource" and "Career Guidance Foundation" marks; (2) the marks are valid and legally protectable; and (3) AcademyOne's use of the mark is likely to create confusion. <u>Checkpoint Systems, Inc. v. Check Point Software Tech., Inc.</u>, 269 F.3d 270, 279 (3d Cir. 2001).  The parties do not dispute the first two elements; rather, AcademyOne claims that CollegeSource has not proven that AcademyOne's use is likely to create confusion.

To determine whether there is a likelihood of consumer confusion, this Circuit applies the factors listed in <u>Interpace</u>

Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983).  "However, economic reality and common sense require that some of the Lapp factors be analyzed differently" depending on the type of claim at issue.  Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 472 (3d Cir. 2005).

The Ninth Circuit has recently addressed the issue of purchasing a competitor's trademarks as AdWords to generate search engine hits.  In Network Automation, it held that certain factors (namely the strength of the mark, evidence of actual confusion, types of goods and degree of care likely to be exercised by the typical purchaser, and the labeling and appearance of the advertisements) were most relevant in AdWords advertising cases.  Network Automation, Inc. v. Advanced Systems Concepts, Inc., 638 F.3d 1137, 1154 (9th Cir. 2011).  Cf. Checkpoint, 269 F.3d at 280 (stating that the weight of the factors depends on the circumstances of the specific case).  This Court agrees, and in analyzing the Lapp factors, it will place emphasis on the four factors noted in Network Automation.

1.   The Strength of the Owner's Mark

CollegeSource's marks in question are both suggestive and commercially strong.  Mark strength is measured by "(1) the distinctiveness or conceptual strength of the mark; and (2) the commercial strength or marketplace recognition of the mark."  A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d

198, 221 (3d Cir. 2000).  The first part of the test examines the features of the marks, while the second looks to factual evidence of "marketplace recognition" or commercial strength.  Id.

Marks are often divided into four classifications in order to determine conceptual strength: generic, descriptive, suggestive, and arbitrary or fanciful.  Id.  Suggestive marks, which are considered conceptually stronger, require consumer imagination in order to determine what the product is; descriptive marks, on the other hand, convey an immediate idea about the product.  Id. at 221-22.

The "COLLEGESOURCE" mark is suggestive.  It is not a literal description of CollegeSource's services, the facilitation of transfers from one school to the other.  Rather, it suggests the general field which CollegeSource serves, and a mental leap is required to move from the "COLLEGESOURCE" mark to CollegeSource's services. "CAREER GUIDANCE FOUNDATION" also does not describe CollegeSource's services.  Even though college transfer could fall under the general heading of "career guidance," it is one possible type of service of many.

In addition, these two marks are commercially strong. CollegeSource has been using "COLLEGESOURCE" for 18 years and "CAREER GUIDANCE FOUNDATION" for over 30 years.  Cooper Decl. ¶¶ 17-18, Apr. 6, 2012 (ECF No. 185).  CollegeSource has also spent hundreds of thousands of dollars advertising its marks, including

print ads in trade show programs and flyers to schools.  Holaday
Decl. I ¶¶ 15-16 (ECF No. 186).

        The strength of the owner's mark is relevant in the
AdWords infringement context because it is probative of possible
confusion.  "[A] consumer searching for a generic term is more
likely to be searching for a product category," instead of
knowing exactly what he is looking for from the outset.  Network
Automation, 638 F.3d at 1149.  Because CollegeSource's marks are
both suggestive and commercially strong, this factor favors
CollegeSource.


        2.  Evidence of Actual Confusion

        There is little evidence showing actual confusion
stemming from AcademyOne's purchase of CollegeSource's marks as
AdWords.

        Although actual confusion is not necessary to find a
likelihood of confusion, a "showing of actual confusion among
*significant numbers* of consumers provides strong support for the
likelihood of confusion."  Playboy Enter., Inc. v. Netscape
Communic'ns Corp., 354 F.3d 1020, 1026 (9th Cir. 2004)) (emphasis
added).  See also Versa Prods. Co., Inc. v. Bifold Co. (Mfg.), 50
F.3d 189, 205 (3d Cir. 1995) ("If a defendant's product has been
sold for an appreciable period of time without evidence of actual
confusion, one can infer that continued marketing will not lead

to consumer confusion in the future. The longer the challenged product has been in use, the stronger this inference will be.").

The record reflects that there have only been 65 instances in which Internet users searched for CollegeSource, were presented with AcademyOne's advertisements, and clicked to AcademyOne's website.  Moldoff Decl. III ¶¶ 18-19 (D. Ex. 3). Moreover, all of these clicks occurred in June 2009, in the span of one month.  Id.  Even assuming that all clicks resulted from consumer confusion and not legitimate advertising diversion or in anticipation of litigation, CollegeSource's evidence of actual confusion is sparse.  See Checkpoint, 269 F.3d at 298-99 (considering 20 instances of actual confusion over a period of five years to be de minimis evidence of actual confusion).  This factor weighs in favor of AcademyOne.


### 3.   Labeling and Appearance of the Advertisements

In the AdWords context, the likelihood of confusion "will ultimately turn" on what the consumer saw on the screen, including labeling and overall appearance.  Network Automation, 638 F.3d at 1153-54.  Even if the ads do not clearly identify a source, partitioning the "search results pages so that the advertisements appear in separately labeled sections for 'sponsored' links" decreases the likelihood of confusion."  Id.

Although AcademyOne does not identify itself in its advertisements, its advertisements are presented in separate

43

sections of the search results.  In each of the Internet search provider's search results, the partitioned area is labeled "sponsored links."  Some are even differentiated by a shaded text box.  In addition, AcademyOne did not use CollegeSource's marks in the actual advertisements themselves; rather, the marks were used as triggers which prompted the advertisements to appear.  Holaday Decl. II, Ex. I (ECF No. 186-9). "The labeling and appearance of the advertisements as they appear on the results page includes more than the text of the advertisement, and must be considered as a whole."  Network Automation, 638 F.3d at 1154.  Given the entire context of the advertisement's appearance, especially the clearly differentiated text boxes and the fact that CollegeSource's name does not appear within the language of the advertisement, the Court finds that this factor weighs in favor of AcademyOne.

4.   Factors Indicative of Care and Attention
     Expected of Consumers When Making a Purchase

This analysis predicts the degree of care an ordinary consumer would use in a particular context.  When, for example, the relevant products are expensive, or the consumer class consists of sophisticated or professional purchasers, confusion is less likely.  Checkpoint, 269 F.3d at 284.  Here, the question is whether an ordinary consumer seeking college transfer information via the Internet is expected to exercise diligence in

his research.  The Court finds that this factor cuts in AcademyOne's direction.

First, the degree of care exercised by Internet users is "becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace."  Network Automation, 638 F.3d at 1152.  Modern Internet users "are accustomed to such exploration by trial and error."  Toyota Motor Sales v. Tabari, 610 F.3d 1171, 1179 (9th Cir. 2010).  The modern Internet user's increasing level of experience with search sites decreases the likelihood that they would be confused by the advertisements at issue in this case.

In particular, consumers seeking to obtain transfer information are likely to practice diligence in their research. Typical consumers are interested in some facet of higher education, be it transferring colleges or returning to school for another degree.  Def. R. Br. 26-27.  Given the importance of their inquiries, they have an incentive to be discerning about the search results they choose to trust.  Thus, "the nature of the particular goods and the relevant consumers" suggest that consumers would exercise prudence in this matter.  Network Automation, 638 F.3d at 1153.

CollegeSource claims that because both parties provide services for free, the level of care exercised by consumers is low.  However, it is not clear that the consumers utilizing search processes are searching for free services exclusively.

45

After all, CollegeSource provides for-charge subscriber services, as well.  Pl.'s Resp. 10.

The level of consumer care and skill is highly relevant to the likelihood of consumer confusion.  <u>Network Automation</u>, 638 F.3d at 1152.  Modern Internet users, particularly ones who are interested in credit distribution in higher education institutions, are not likely to be confused by Internet advertising.  Thus, the Court finds that this factor weighs in AcademyOne's favor.

5.   <u>The Degree of Similarity Between the Owner's Mark and the Alleged Infringing Mark</u>

In the context of AdWords advertising, this factor should not favor either party.  The factor is especially relevant when a consumer confronts two different trademarks and, due to their similarity, has trouble distinguishing between the two.  In the AdWords context here, the consumer enters one trademark as a search term and sees a sponsored link that displays neither. Holaday Decl. II, Ex. I (ECF No. 186-9).  Indeed, <u>Network Automation</u> cautions against placing an "artificial distinction" in such factors. 638 F.3d at 1151. This Court agrees and will place little weight on this factor.

6.   <u>The Intent of the Defendant in Using the Mark</u>

In evaluating this factor, courts "look at whether the defendant chose the mark to intentionally confuse consumers, and thereby capitalize on the senior user's goodwill, and whether the defendant gave adequate care to investigating its proposed mark." <u>Sabinsa Corp. v. Creative Compounds, LLC</u>, 609 F.3d 175, 187 (3d Cir. 2010).   In the AdWords context, the defendant's intent is relevant as evidence that the trademark is used to mislead consumers instead of truthfully informing them of their choices, but should not be weighed in isolation.   <u>Network Automation</u>, 638 F.3d at 1153.

There is no evidence that AcademyOne adopted CollegeSource's marks in order to intentionally confuse.   The only evidence CollegeSource produces to support its assertion is that AcademyOne knew of CollegeSource's marks at the time it purchased its AdWords.   AcademyOne's knowledge of the marks is insufficient to infer an intent to capitalize on CollegeSource's goodwill.   AcademyOne may have used CollegeSource's mark in order to "truthfully inform [consumers] of their choice of products." <u>Network Automation</u>, 638 F.3d at 1153; <u>see also</u> <u>Lindy Pen Co., Inc. v. Bic Pen Corp.</u>, 725 F.2d 1240, 1248 (9th Cir. 1984) ("Liability for infringement may not be imposed for using a registered trademark in connection with truthful comparative advertising.").   This factor weighs in favor of AcademyOne.

7.   Similarity in Channels of Trade, Marketing, and
     Advertising

If the parties have similar marketing campaigns and
advertise through the same media channels, there is a greater
likelihood of confusion.  Checkpoint, 269 F.3d at 288-89.
However, "this factor becomes less important when the marketing
channel is less obscure."  Network Automation, 638 F.3d at 1151.

It is undisputed that CollegeSource does not, nor has
it ever, engaged in Internet advertising via AdWords.  Cooper
Dep. 144:20-25 (D. Ex. 13).  Instead, CollegeSource primarily
markets through print materials and attendance at trade shows and
conferences.[8]  Holaday Decl. II ¶ 15 (ECF No. 186).  Moreover, the
Internet is not an "obscure" marketing channel, and advertising
via AdWords has become increasingly prolific.  Thus, this factor
favors AcademyOne.

8.   Similarity in Targets of the Parties' Sales
     Efforts and

9.   Similarity of the Goods' Function

These factors both favor CollegeSource.  First, both
parties target educational institutions.  Both parties placed
bids to build a web-based transfer system for South Carolina

---

[8] CollegeSource asserts that it uses the Internet to
advertise, but not through AdWords. Holaday Decl. ¶ 15; Cooper
Dep. 144:20-25 (D. Ex. 13).

colleges.  D. Ex. 77.  AcademyOne has produced similar products for several other states, including Pennsylvania and Delaware. Tr. Prelim. Inj. Hr'g 119:9-21.  CollegeSource also serves many colleges directly via its CataLink system.  Novak Dep. 82:20-83:11 (D. Ex. 6).  Second, both parties offer similar products. Both provide course databases in efforts to ease the college transfer process for students and institutions.

The Court considers this factor in favor of CollegeSource.  However, given the context in which the advertisements appear, notably the differentiation in their appearance and the sophistication of the typical consumer, the Court gives this factor minimal overall weight.  See Network Automation, 638 F.3d at 1150 (employing similar analysis for the "proximity of the goods" factor).

In conclusion, CollegeSource has not demonstrated that AcademyOne's AdWords cause consumer confusion.  Of the four factors highlighted by the Ninth Circuit in Network Automation, three weigh in favor of AcademyOne and only one weighs in favor of CollegeSource.  The remaining Lapp factors do not strongly weigh in favor of CollegeSource and are insufficient to outweigh the analysis above.  Therefore, the Court grants AcademyOne's motion for summary judgment with regard to the trademark infringement and unfair competition claims under the Lanham Act.

49

E.   <u>The Plaintiff's Trademark Invalidity Claim Under U.S.</u>
<u>Lanham Act</u>

Under 28 U.S.C. § 2201(a), a court may only consider a declaratory judgment action in a "case of actual controversy," or when the plaintiff has standing to bring the claim.  A case of actual controversy is definite and concrete.  <u>Wyatt, V.I., Inc.</u> <u>v. Gov't of the V.I.</u>, 385 F.3d 801, 806 (3d Cir. 2004).  Claims based upon hypothetical or abstract infringements of rights do not warrant judicial intervention.  <u>Id.</u>  The Court will grant the defendant's motion for summary judgment on the trademark invalidity claim because the plaintiff lacks statutory standing to seek declaratory judgment.

Here, CollegeSource's claim for standing relies on the supposition that AcademyOne's registration on the Supplemental Register may eventually be moved to the Principal Register and become enforceable against CollegeSource.  Pl.'s Resp. 111.  In addition, CollegeSource claims that "[g]iven CollegeSource's current and anticipated future use of CollegeTransfer.com, its status as Defendant's primary competitor, and the fact that Defendant has already sought to enforce its supposed 'trademark rights' against CollegeSource, CollegeSource has a real interest in resolving the issue of Defendant's lack of rights to CollegeTransfer.net."  <u>Id.</u>

CollegeSource's first claim for standing is unpersuasive because it is contingent upon hypothetical events that may occur in a number of ways not able to be anticipated. See Wyatt, 385 F.3d at 808.  CollegeSource's second basis, that AcademyOne previously attempted to enforce its mark, is an even weaker argument, as the previous action has already been resolved in CollegeSource's favor.  See AcademyOne, Inc. v. CollegeSource, Inc., No. 08-5707, 2009 WL 5184491 (E.D. Pa. Dec. 21, 2009). Summary judgment will be granted in AcademyOne's favor on the Declaration of Trademark Invalidity claim.

F.   The Plaintiff's False Advertising Claim Under U.S. Lanham Act

To establish a false advertising claim under the Lanham Act, a plaintiff must prove:  1) that the defendant has made false or misleading statements as to his own product or that of another; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material and likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff.  Pernod Ricard USA., LLC v. Bacardi U.S.A., Inc., 653 F.3d 241, 248 (3d Cir. 2011).

At issue in this case is the second requirement, whether a commercial statement is either literally and unambiguously false, or literally true or ambiguous but with the tendency to deceive consumers.  Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 586 (3d Cir. 2002).  If a claim is literally false, the finder of fact need not consider whether the public was actually misled.  Id. at 586.  If a claim is not literally false, the plaintiff must show either actual deception or that the claim had a tendency to deceive.  Id.

### 1.   AcademyOne's Database Representations

AcademyOne makes several statements on its website regarding its course database, including that it is "published annually" with "current course offerings," the "most comprehensive database of current course offerings possible," not "outdated," and "reliable, accurate, and up-to-date." Papaefthimiou Decl. Exs. 28-30, Apr. 6, 2012 (ECF Nos. 187-26 to 28).  CollegeSource claims that these statements are false and misleading.  As evidence to support this assertion, CollegeSource submits a single course description from AcademyOne's website which CollegeSource claims came from a 2006-07 catalog.  Pl.'s Resp. 121-22.

Although CollegeSource's evidence does show that a course description on AcademyOne's website replicates an older catalog, it does not establish that the description is out of date or not current.  CollegeSource has not produced any evidence regarding whether Bergen Community College still offers PSY 108, or whether the current course description differs from the one in AcademyOne's database.  It is possible that even though AcademyOne's course description is from a 2006-07 course catalog, the information is still current.

Moreover, CollegeSource has not shown that AcademyOne's representations have a tendency to deceive.  CollegeSource claims that because AcademyOne does not provide the date when the course description was last modified, its advertisements are misleading.  Id. at 122-23.  The Court disagrees.  CollegeSource's single piece of evidence does not sufficiently establish that the intended audience would be deceived by AcademyOne's assertions.  The Court therefore grants summary judgment with respect to the false advertising claim stemming from AcademyOne's database representations.

2.   AcademyOne's Letters to Colleges Under Freedom of Information Laws

AcademyOne made several statements in its letters to colleges under freedom of information acts, including that

CollegeSource filed copyright claims against AcademyOne, that CollegeSource attempted to preclude AcademyOne and other software providers from providing student transfer systems, and that CollegeSource claimed ownership of college catalog copyrights. CollegeSource claims that these representations are false and misleading.  Summary judgment will be granted in favor of AcademyOne on these claims.

In its earlier preliminary injunction decision, the Court held that CollegeSource's false advertising claims are unlikely to succeed because the statements are not literally false and there is insufficient evidence that the letters have a tendency to deceive the intended audience.  First, the description of the lawsuit as copyright is not literally false. Mr. Moldoff testified that his reference to copyright was meant to refer to CollegeSource's Copyright Notice and Disclaimer, not to a legal cause of action.  Tr. Prelim. Inj. Hr'g. 132:19-133:16.  The Court finds that Mr. Moldoff's understanding of the situation, and his subsequent statement to that effect, were reasonable and cannot be considered literally false.

Since the preliminary injunction hearing, the only new evidence introduced by CollegeSource for this claim is the fact that an attorney may have had a role in drafting the letter. Pl.'s Resp. 125-26.  This evidence is presumably introduced to rebut the Court's previous statement that "although no violation

of copyright law is asserted in this lawsuit, such an understanding and description is a reasonable characterization of this matter for a non-lawyer to make." CollegeSource, Inc. v. AcademyOne, Inc., No. 10-3542, 2011 WL 1540403, at *8 (E.D. Pa. Apr. 22, 2011). Although the Court's reasoning referred to the fact that a non-lawyer drafted the letter, the fact that a lawyer may have been involved does not negate the Court's overall conclusion.

Second, CollegeSource contends that because only AcademyOne is the subject of this lawsuit, AcademyOne's claim that CollegeSource is attempting to preclude other software developers from offering course transfer software is literally false. However, Mr. Moldoff has testified that he believed that Harry Cooper, the founder of CGF, threatened other software developers with suit if they similarly copied CollegeSource's course descriptions. Tr. Prelim. Inj. Hr'g 133:17-136:4. AcademyOne's claim regarding "other software developers" was not unambiguously false given the fact that CollegeSource's founder may have threatened other developers with suit.

Finally, no reasonable jury could find Mr. Moldoff's statement that "CollegeSource claims control of the digital catalogs they collect, even if they reside on your website," was unambiguously false. As part of this suit, CollegeSource has asserted contract claims stemming from the Copyright and

Disclaimer Information pages included in each of its digitized college catalogs.  CollegeSource thus claims that every catalog containing that notice is subject to the conditions contained within.  This makes Mr. Moldoff's statement at least ambiguous, if not true.

Because no reasonable jury could find that Mr. Moldoff's statements in the freedom of information letters were unambiguously and literally false, CollegeSource must show that they had a tendency to deceive.  CollegeSource has submitted evidence that as a result of Mr. Moldoff's letters, some schools contacted CollegeSource and expressed their concern, and at least one of CollegeSource's clients pulled their catalogs from CollegeSource databases.  Tr. Prelim. Inj. Hr'g 52:7-9, 53:4-14. This evidence is insufficient to demonstrate that AcademyOne's statements had a tendency to deceive "a substantial portion of the intended audience."  Warner-Lambert v. Breathasure, 204 F.3d 87, 91-92 (3d Cir. 2000) (citations omitted).  See also Novartis Consumer Health, 290 F.3d 578, 594 (3d Cir. 2002) (holding that survey evidence that 15% of the respondents were misled was sufficient to establish actual deception or a tendency to deceive).

When the Court in April 2011 denied CollegeSource's motion for a preliminary injunction, it held that CollegeSource's false advertising claim stemming from the freedom of information

56

letters was unlikely to succeed on the merits because the statements were not literally false and CollegeSource had not produced evidence showing that they had a tendency to deceive. CollegeSource, Inc. v. AcademyOne, Inc., No. 10-3542, 2011 WL 1540403, at *7-9 (E.D. Pa. Apr. 22, 2011).  Despite a year of fact and expert discovery, CollegeSource still has not produced sufficient evidence showing that the allegedly false statements had a tendency to deceive.  As such, the Court's logic and reasoning from that preliminary injunction still apply.  The Court grants AcademyOne's motion for summary judgment for the false advertising claim stemming from the freedom of information letters.

## IV.  Conclusion

In sum, the plaintiff has not pointed to sufficient evidence to permit a reasonable jury to find in its favor on Counts 3 through 9 of the Amended Complaint.  Because the plaintiff has raised no genuine issue of material fact, the defendant is entitled to summary judgment on all remaining counts.  The defendant's motion is granted and judgment is entered in AcademyOne's favor.

An appropriate order shall issue separately.